

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES of AMERICA, and STATE OF ILLINOIS, ex rel. DONALD RAYMER, and MICHAEL GROSCHE,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNIVERSITY OF CHICAGO HOSPITALS,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 03 C 806 |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendants University of Chicago Hospitals ( "Hospital") motions to dismiss. For the reasons stated below, we grant in part and deny in part as moot the Hospital's motion to dismiss brought pursuant to Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)"). We also deny as moot the Hospital's motion to dismiss brought pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(1)" and "Rule 12(b)(6)").

Relators Donald Raymer and Michael Grosche ("Relators") have filed a first amended complaint and the State of Illinois ("Illinois"), which intervened as a Plaintiff, has filed a separate complaint in this case. Relators represent themselves as former Hospital employees who worked as registered nurses in the Hospital's Neonatal Intensive Care Unit ("NICU") and Neonatal Intermediate Care Nursery ("IMN/IMC"), which are run collectively as one unit in Chicago, Illinois. All of the babies admitted to the Hospital's NICU allegedly are premature, and/or have severely low birth weights, and/or have a host of other serious medical ailments. (R. A. Compl. Par. 12). Relators assert that the severity of these babies' conditions necessitates treatment in isolated NICU bed spaces. Various medical authorities and guidelines allegedly recommend or require that these spaces each consist of a minimum of 80-150 square feet and be separated from adjacent bed spaces by a minimum of four to eight feet.

Relators contend that despite the precarious health of the infants admitted to the NICU, the Hospital "double bunked" and occasionally "triple-bunked" babies by "plac[ing] them back to back in radiant warmers, isolettes, or open cribs in a bed space designed for only one infant." (R. A. Compl. Par. 16). Relators further assert that "the single bed space [was] equipped with only one regular monitor and a single space for bedside supplies," and that "[b]abies [were] forced to share 'set ups,' including medical air, vacuum and oxygen sources, bedside supplies, and needle and biohazard receptacles." (R. A. Compl. Par. 16). Relators allege that the Hospital's

2

incentive was to double-bunk because the Hospital is allegedly paid or reimbursed on a per capita per diem, not a per bed per diem, basis. By double-bunking, the Hospital could therefore allegedly exceed the maximum number of NICU beds and allegedly earn profits in excess of its medically advisable and permissible patient capacity. (R. A. Compl. Par. 31). The Hospital allegedly justified its double-bunking practices to concerned employees, including Relators, by citing internal budget-cuts. Relators contend that the Hospital hid its double-bunking practices from Illinois state inspectors and other official health inspectors by moving some babies off the ward and single-bunking the remaining infants whenever such officials visited the NICU.

Relators allege that the Hospital's double-bunking practices and inadequate staffing fostered serious medical errors and unsanitary conditions. In addition, the Relators claim that the Hospital NICU staff failed to follow accepted protocols in isolating infants infected with life-threatening, treatment-resistant infectious diseases. Instead, the Hospital staff allegedly continued double-bunking practices until "at least four babies were infected" during a disease outbreak between and among infants in the NICU. (R. A. Compl. Par. 29, 30). Relators contend that the combination of double-bunking and failing to immediately isolate infected NICU infants resulted in an extraordinarily high rate of serious infections, lengthier and more costly hospitalizations, and at least one baby's death.

Relators claim that the Hospital submitted fraudulent reimbursement bills to both Medicaid, a federal program for indigent medical care administered in Illinois by a state agency, and Tri-Care, a federal program that oversees medical payments for

3

military personnel and their families in civilian facilities. Illinois asserts that the fraud underlying the Hospital's reimbursement requests stems from legal requirements that a health care provider attest that its services are "of a quality which meets professionally recognized standards of health care" to qualify for Medicaid reimbursement. (Ill. Compl. Par. 35-43). Illinois asserts that the Hospital's double-bunking, inadequate infection control, and overcrowding ("overcensus") practices did not qualify for Medicaid reimbursement. (Ill. Compl. Par. 35-43).

The Hospital allegedly billed the state of Illinois and federal agencies more than $1,500 per day, per infant in the NICU or IMN/ICN. While the Hospital was allegedly double-bunking babies since at least either 1997 according to Illinois' complaint (Ill. Compl. Par. 39), or September 1993 according to Relators' first amended complaint (R. A. Compl. Par. 51), Illinois specifically asserts that there were at least 1,275 double-bunked patient days in 2001, of which at least 537 were patient days reimbursed by Medicaid. (Ill. Compl. Par. 37). Double-bunking in the Hospital's NICU was allegedly detected in late 2003, by inspectors working for the Illinois Department of Public Health ("IDPH"). (Resp. 12(b)(1) & 12(b)(6) Mot. 3). Despite this alleged detection, additional instances of double-bunking allegedly occurred until June 7, 2005. (Ill. Compl. Par. 28).

Relators allege in their first amended complaint that the Hospital violated the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, by making Medicaid and Tri-Care reimbursement claims while willfully and intentionally double-bunking infants (Count 1), by exceeding the Medicaid-permitted number of infants in the

Hospital's NICU (Count 2), and by failing to control infant infection in the NICU (Count 3). Relators also contend that the Hospital violated the Illinois Whistleblower Reward and Protection Act ("IWRPA"), 740 ILCS 175/1 *et seq.*, by these same three alleged sets of actions: double-bunking (Count 4), overcensus (Count 5), and tolerating infection (Count 6).

Illinois claims that the Hospital violated the IWRPA, 750 ILCS/3(a) *et seq.* (Count 1) and the Illinois Public Assistance Fraud Act ("IPAFA"), 305 ILCS § 8A-7(b) *et seq.*, (Count 2), and committed common law fraud (Count 3) by double-bunking infants in its NICU and IMN/IMC and then submitting claims that indicated otherwise to Illinois' Medicaid program. In addition, Illinois asserts that by remunerating the Hospital for double-bunked infants, Illinois committed payment by mistake of fact (Count 4). Finally, Illinois has requested an injunction against the Hospital to prevent future unlawful instances of infant double-bunking in the NICU or IMN/ICN (Count 5).

The Hospital has filed two separate motions to dismiss, one pursuant to Rule 12(b)(1) and Rule 12(b)(6), and another pursuant to Rule 9(b), to both Relators' first amended complaint and Illinois' complaint.

## LEGAL STANDARD

The Seventh Circuit has indicated that "[i]n response to an ordinary 12(b)(6) motion, a court simply examines the allegations in the complaint to determine whether they pass muster." *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d

1074, 1080 (7th Cir. 1997). This means that the court must draw all reasonable inferences that favor the plaintiff, construe the allegations of the complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint. *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002); *Perkins v. Silverstein*, 939 F.2d 463, 466 (7th Cir. 1991). With the possible exception of a motion to dismiss pursuant to Rule 9(b), "a plaintiff is not required to plead the facts or elements of a claim." *Dunkin Donuts, Inc. v. Tejany & Tejany, Inc.*, 2006 WL 163019, at *1 (N.D. Ill. 2006) (citing *Swierkiewicz v. Sorema*, 534 U.S. 506, 511 (2002)); *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002)).

A complaint need not plead actual facts, but it must allege the "operative facts" upon which each claim is based. *Kyle v. Morton High School*, 144 F.3d 448, 454-55 (7th Cir. 1998); *Lucien v. Preiner*, 967 F.2d 1166, 1168 (7th Cir. 1992). A complaint does not necessarily have to allege operative facts for every element of a claim. *See Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (stating that "[a]t this stage the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint" and that "[m]atching facts against legal elements comes later"). Instead, "[o]ne pleads a 'claim for relief' by briefly describing the events." *Id.* at 251. A plaintiff may even plead conclusions in place of alleging some operative facts. *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002); *Kyle*, 144 F.3d at 455. However, any conclusions pled "must provide the defendant with at least minimal notice of the claim," *id.*, and a plaintiff cannot satisfy

federal pleading requirements merely "by attaching bare legal conclusions to narrated facts which fail to outline the bases of [his] claims." *Perkins*, 939 F.2d at 466-67.

## DISCUSSION

I. Relators' FCA Claims

The Hospital argues that Relators have failed to plead their three FCA claims (Relator Counts 1-3) with required specificity. Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). In regard to fraud claims, the purposes of Rule 9(b) are: "(1) protecting a defendant's reputation from harm; (2) minimizing 'strike suits' and 'fishing expeditions'; and (3) providing notice of the claim to the adverse party." *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1327 (7th Cir. 1994). There is an exception to the heightened pleading requirement under Rule 9(b) if the plaintiff was denied access to information about the fraud at the time the complaint was filed, in which case the "Rule 9(b) . . . requirement must be relaxed." *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998).

The particularity requirement in Rule 9(b) does not require a plaintiff to plead with particularity the entire theory of the case, but rather, only those "circumstances" intrinsic to any fraud-based claim. *See Midwest Commerce Banking Co. v. Elkhart City Ctr.*, 4 F.3d 521, 524 (7th Cir. 1993); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (holding that "states of mind may be pleaded generally, [but] the 'circumstances' must be pleaded in detail," and that "[t]his means the who, what,

when, where, and how: the first paragraph of any newspaper story"); *see also Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003). The Seventh Circuit has further indicated that such circumstances include "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Wade v. Hopper*, 993 F.2d 1246, 1250 (7th Cir. 1993) (quoting *Schiffels v. Kemper Financial Servs.*, 978 F.2d 344, 352 (7th Cir. 1992)).

The Hospital has filed two motions to dismiss, one pursuant to Rule 9(b) and another pursuant to Rules 12(b)(1) and 12(b)(6). Relators and Illinois have responded jointly to both motions. Typically, "the court may consider only the plaintiff's complaint" in deciding a motion to dismiss. *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002); *see also Berthold Types Ltd. v. Adobe Sys.*, 242 F.3d 772, 775 (7th Cir. 2001) (holding in a case in which a contract that was central to the claim was not attached to the complaint, that "once the district court *actually considers* additional documents, the motion [to dismiss under Rule 12(b)(6)] must be treated as one for summary judgment") (emphasis in original). The multiple exhibits that Illinois has attached to its complaint may be considered in determining the adequacy of Illinois' pleadings. *See* Fed. R. Civ. P. 10(c) (providing that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes"). Relators' first amended complaint, however, has no attached exhibits of its own and fails to refer to Illinois' complaint or attached exhibits. Therefore, we cannot consider Illinois' complaint and the attached exhibits in ruling on the

8

adequacy of Relators' pleadings. *See Gavin v. AT&T Corp.*, 2004 WL 2260632, at *1 (N.D. Ill. 2004) (stating that "'documents attached to a motion to dismiss are considered part of the pleadings if *they are referred to in the plaintiff's complaint* and are central to his claim,'" and concluding that even if "defendants' submissions appear to be 'central to the complaint,' but not one is expressly referenced therein, [] they are beyond the scope of the pleadings") (quoting *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998)) (emphasis in original); *see also Wilkins v. North American Construction Corp.*, 101 F.Supp. 2d 500 (S.D. Tex. 2000) (considering co-plaintiffs' complaints separately in an FCA case). Therefore, we hereafter consider the Relators' amended complaint and Illinois' complaint separately in deciding the pending motions to dismiss.

The Hospital asserts that Relators have failed to plead with the particularity required by Rule 9(b) their three claims that are brought under the FCA, 31 U.S.C. § 3729, *et seq.* In regard to FCA claims, the Seventh Circuit has held that "[t]he FCA is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b)." *Gross v. Aids Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005) (citing *Garst*, 328 F.3d at 376). Accordingly, FCA fraud pleadings must allege considerable detail, as Seventh Circuit decisions evidence. *See id.* at 605 (finding that "[a]ll we have are generalized allegations that . . . shed no light on the nature or content of the individual forms or why any particular false statement would have caused the government to keep the funding spigot open, much less when any payments occurred or how much money was involved"); *Sears v.*

*Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (finding that plaintiffs failed "to satisfy [the] 9(b) standard: their complaint is bereft of any detail concerning who was involved in each allegedly fraudulent activity, how the alleged fraud was perpetrated, or when the allegedly fraudulent statements were made," and criticizing the complaint because it "lumps all the defendants together and does not specify who was involved in what activity").

Relators allege three federal claims under the FCA. Count One alleges a violation of the FCA due to alleged double-bunking of babies in the NICU. Count Two alleges a violation of the FCA stemming from infant overcensus in the NICU. Count Three alleges a violation of the FCA due to inadequate infection controls. In general, the factual allegations that are material to a fraud claim are case-specific even for the same kind of fraud, such as FCA-based fraud. *See Peterson v. Community Gen. Hosp.*, 2003 WL 262515 at *2 (N.D. Ill. 2003) (identifying case-specific material allegations for fraudulent billing of Medicare under the FCA). To survive the motion to dismiss pursuant to Rule 9(b), Relators must properly allege for each FCA claim the following material elements: A) the predicate acts relating to double bunking, overcensus, and infection control violations that the Hospital's NICU staff permitted (Material Element 1), B) that the necessary predicate acts were non-technical violations of federal and state medical practice regulations (Material Element 2), C) that the billing of the allegedly fraudulent claims was authorized by Hospital personnel (Material Element 3), D) that Hospital personnel made misrepresentations about the NICU infants' care (Material Element 5), and E) that

these misrepresentations were made to Medicaid, Tri-Care, or both with the aim of being reimbursed for the NICU infants' care (Material Element 6).

## A. Material Element 1: The Predicate Acts

Relators must plead with particularity the predicate acts for Counts 1-3, which relate to double-bunking, overcensus, and infant infection violations respectively. *See Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992) (holding in a RICO case that "the complaint must, at minimum, describe the predicate acts with some specificity and 'state the time, place, and content of the alleged communications perpetrating the fraud'") (quoting *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 992 (7th Cir. 1991)); *Obert-Hong v. Advocate Health Care*, 2001 WL 303692, *2 (N.D. Ill. 2001) (rebuking plaintiffs in an FCA case for failing to identify doctors who participated in predicate act of contract signing leading up to alleged fraud). Thus, just as is true for the individuals who misrepresent actions to perpetrate the financial stage of a fraud, so too must a plaintiff plead with specificity "the who, what, when, where, and how" of the predicate acts of that fraud. *DiLeo*, 901 F.2d at 627.

Generally, Relators appear to recognize that they have failed to specifically plead the "who" element of all three predicate acts that allegedly occurred in the NICU, given their suggestion that any failure on their part to plead specific details about "who decided to double-bunk babies, overcrowd the neonatal intensive care unit . . . and willfully ignore . . . infection controls" is because such specific details

11

are "in the exclusive possession of defendants, and [Relators] need not allege them under 9(b)." (Resp. 9(b) Mot. 5). We reject this argument, inasmuch as Relators, allegedly nurses who worked for extended periods in the NICU, should be capable, at a minimum, of identifying the titles or positions of those responsible superiors and perhaps others who allegedly promoted these NICU medical practices. Allegations about specific individuals who allegedly committed on one or more occasions one or more of the three predicate acts against Medicaid or Tri-Care infants must be pled.

Relators argue in the alternative that their complaint does specifically identify those individuals responsible for the three predicate NICU practices. (Resp. 9(b) Mot. 5-6). However, most of Relators' allegations refer only to "U of C Hospital" or "U of C Hospital management." (R. A. Compl. Par. 16, 29, 31-34, 41-43, 45, 47-49, 51, 53, 54, 56, 57, 61). We note that at least one other court has held that the "who" element of fraud is not satisfied by making vague allegations about a corporation whose particular employees allegedly committed fraud. *See Robinson v. Northrop Corp.*, 149 F.R.D. 142, 145 (N.D. Ill. 1993) (noting that "plaintiffs argue that where the defendant is a corporation there is no need to specify in the complaint the role of each individual defendant," yet finding that "the identity and/or role of the individual employee involved in the alleged fraud must be specified in the complaint, since such information is within the relator's knowledge"). Even for those instances in which Relators allege or imply that they themselves were eyewitnesses to improper medical treatment in the NICU, they fail to allege *who* directed or engaged in the mistreatment. (R. A. Compl. Par. 19, 20, 33, 47, 48). In sum, we find that Relators

have not pled with particularity as to who in the Hospital authorized or mandated *any* of the alleged practices of double-bunking infants, overcrowding the NICU, and tolerating serious infection outbreaks among NICU infants. Relators have also not shown that they were denied access to such information.

Relators have also failed to plead with the necessary specificity other aspects of the predicate acts, including (a) when these acts occurred, (b) which particular Medicaid or Tri-Care infants suffered from which of the three allegedly illegal practices, and (c) how the acts were carried out.

### 1. Double-Bunking by the Hospital (Count 1)

Relators allege that double-bunking "is routine" in the Hospital's NICU. (R. A. Compl. Par. 16, 19, 20, 22, 29, 31, 33, 34, 42, 47, 53). As a specific example, Relators allege that the Hospital's NICU staff sheet of November 15, 2001, reflects that during an Illinois Department of Public Health ("IDPH") inspection, one baby was simultaneously moved from his double-bunked bed space. (R. A. Compl. Par. 36). Relators also allege that concealment of double-bunking practices from public health inspectors is a regular occurrence, and indicate that in late 2003, the IDPH detected double-bunking in the Hospital's NICU. (R. A. Compl. Par. 10, 34, 43). Relators allege that on multiple undated Hospital Nursing Assignment Sheets and Census sheets, double-bunked babies are denoted as having "A" or "B" designations for a particular bed space, or "C" in the case of triple-bunking, and in more recent reports, by the recording of non-existent "phantom" bed space numbers in reference

to double-bunked infants. (R. A. Compl. Par. 17, 35). Relators allege that they personally witnessed multiple instances on unidentified dates in which a double-bunked baby had to be physically removed from its bed space to permit Hospital caregivers adequate access to the other double-bunked infant in emergency situations. (R. A. Compl. Par. 20). Relators further allege that on multiple unidentified dates, they personally witnessed hazardous medical conditions in which medical charts, treatments, or medical devices were applied to the incorrect infant in a double-bunked setting. (R. A. Compl. Par. 19). In addition, Relators specify twenty-four pseudonymous infants whom they allege were double-bunked in the NICU during 2001. (R. A. Compl. Par. 47, 48). Accordingly, with regard to the Hospital's alleged practice of double-bunking NICU infants, we find that while Relators have generally pled that double-bunking occurred, they have failed to plead who in particular engaged in the double-bunking on behalf of the Hospital. Therefore, we find that Relators have not properly pled the predicate act relating to double bunking for Count 1.

### 2. Overcensus by the Hospital (Count 2)

Relators allege in regard to their claim of overcensus in the NICU that the IDPH sets maximum patient numbers that hospitals, including the Hospital, may admit to their NICU at any given time. (R. A. Compl. Par. 41, 52). Relators furthermore allege that at unidentified times, double-bunking was done to permit NICU overcapacity. (R. A. Compl. Par. 53). While Relators may have satisfactorily

14

alleged that overcrowding was occurring, they have failed to specify when it occurred and who in particular participated in it. Relators also fail to specifically plead which particular infants who were covered by Medicaid or Tri-Care were admitted to the NICU during a period of alleged overcrowding. Therefore, we find that Relators have not pled with particularity the predicate act relating to overcensus for Count 2.

### 3. Inadequate Infection Controls by the Hospital (Count 3)

Relators allege in regard to the Hospital's's inadequate infection controls that because of double-bunking practices, the NICU is an environment that facilitates the spread of serious and potentially fatal, hospital-acquired, treatment-resistant communicable diseases, such as Serratia meningitis and methicillin-resistant *Staphylococcus aureus* ("MRSA"). (R. A. Compl. Par. 21, 22, 25, 26, 27). Relators contend that the Hospital's NICU has infection and colonization rates of MRSA and Serratia meningitis well above national NICU averages. (R. A. Compl. Par. 28). Relators further contend that the Hospital intentionally fails to isolate infected babies until at least four babies are infected to avoid incurring additional costs. (R. A. Compl. Par. 29, 42, 45, 46).

As a specific example, Relators allege that the Hospital's NICU staff meeting minutes of September 21, 2001, reflect that during a particular outbreak among 52 babies in the NICU, seventy-five percent were colonized with Serratia or MRSA pathogens and fifteen percent became infected. (R. A. Compl. Par. 22). Relators claim that during this alleged outbreak, there was blood on the countertops and there

were bacterial cultures on the telephone and other NICU equipment. According to Relators, Hospital administrators allegedly advised that these contaminations had to be cleaned up "in anticipation of an upcoming visit" from a public health inspection agency. (R. A. Compl. Par. 23). As a second specific example, Relators assert that on July 12, 2002, a pseudonymous baby infected with Klebsiella and Pseudomonas *aeruginosa* was admitted to the NICU, and within a few days, four other pseudonymous babies within proximity of this infected infant themselves had also become infected with either or both diseases. (R. A. Compl. Par. 30). Relators contend that one of those babies died within a month of contracting Pseudomonas *aeruginosa*, due predominantly to that infection. (R. A. Compl. Par. 30). As a third specific example, Relators allege that a pseudonymous premature baby who had been double-bunked in the NICU beginning in January 2001, contracted Serratia meningitis and, despite his infection, was transferred thirteen times between bed spaces, four times being double-bunked, during an ensuing ten month period. Relators allege that this baby suffered "neurological devastation" from his infection and died of cardiopulmonary failure in October 2001. (R. A. Compl. Par. 48).

Given the three specific examples of inadequate infection controls alleged by Relators, we find that Relators have adequately pled how the infection occurred, have provided specificity about which individual infants became infected, and have adequately pled when it occurred. However, as discussed above, Relators have not indicated who at the Hospital was involved in tolerating this spread of infection, or who set or maintained the policy that four babies had to become infected before the

16

Hospital acted to prevent the further spread of disease. Therefore, Relators have not sufficiently pled the predicate act relating to inadequate infection controls for Count 3. Accordingly, we find that Relators have not adequately pled Material Element 1, the three predicate acts for Counts 1-3, with particularity.

### B. Material Element 2: Non-Technical Violations of Federal and State Regulations by the Hospital

Relators allege that medical and public health inspector laws and guidelines have been violated by the Hospital's three alleged predicate acts relating to double-bunking NICU infants, permitting NICU overcensus, and permitting infectious disease outbreak in the NICU. Despite this oft-repeated allegation, Relators do not indicate which statutes or guidelines the Hospital violated. The deficiency of Relators' general accusation, that "U of C Hospital expressly certify that they [*sic*] comply with all state and federal laws and accreditation guidelines as a condition of reimbursement" (R. A. Compl. Par. 41), becomes all the more apparent by comparison to the Illinois Complaint, which identifies specific laws and regulations that Illinois alleges the Hospital to have violated. (Ill. Compl. Par. 13-21, 23, 29, 40-43). The Seventh Circuit has clearly held at a similar stage of proceedings that "minor technical regulatory violations do not make a claim 'false' for purposes of the FCA; the existence of mere technical regulatory violations tends to undercut any notion that a prior representation of regulatory compliance was knowingly and falsely made in order to deceive the government." *Gross*, 415 F.3d at 604 (citing *Lamers v.*

*City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999)). Despite admittedly graphic

allegations that Relators make about NICU treatment of infants (R.A. Compl. Par. 16,

18-24, 28-33, 42, 44, 49, 57), without knowing *which* regulations are at issue, we

cannot determine whether alleged violations of unidentified regulations are merely

technical or instead so sufficiently serious that certifications of regulatory compliance

made to Medicaid or Tri-Care in conjunction with reimbursements for the allegedly

affected NICU infants amounted to fraudulent misrepresentations. The Seventh

Circuit has been clear on this issue. *See Gross*, 415 F.3d at 605 (indicating that

"reference to the 'regulatory framework'" was insufficient "to clarify the causal

connection between false certifications and government payouts" and stating that it is

"not incumbent upon the district judge to become an expert in all of the regulations . .

. so that he [can] piece together a theory on why any particular form listed in the . . .

complaint might have fraudulently caused the government to cut a check"). Thus,

with regard to whether the alleged double-bunking, overcensus, or toleration of

infection violated state and federal regulations or guidelines, we find that Relators

have not met the Rule 9(b) pleading standard.


## C.  Material Element 3: Billing of Claims by the Hospital

Relators allege that the Hospital submitted fraudulent claims. Relators,

however, must also allege that the billing of the allegedly fraudulent claims was

actually authorized by the Hospital. Under Rule 9(b), this means Relators must plead

with particularity "the identity of the person making the misrepresentation" or, in

other words, the Hospital personnel who authorized the billing. *Wade*, 993 F.2d at 1250 (quoting *Schiffels*, 978 F.2d at 352). As we noted previously, simply alleging that "U of C Hospital" or "management" billed for infants subjected to double-bunking, overcensus, or infection control violations, which is precisely what Relators state in their complaint (R. A. Compl. Par. 37, 45, 46, 51, 56, 59, 61, 66, 68, 76, 79, 87, 89), does not suffice as pleading with particularity. Relators do indirectly identify one individual within the Hospital hierarchy when they state that "[t]he director at the U of C Hospital describes the NICU as the 'money-maker' for the hospital." (R. A. Compl. Par. 31). Yet this allegation sheds virtually no light on the director's involvement in the alleged Medicaid or Tri-Care fraud, given that a legitimate, upstanding hospital practice can be just as profitable as a fraudulent one. While Illinois makes specific allegations about the names of individuals who billed Medicaid for NICU infants in its complaint and has attached exhibits to bolster these allegations, we cannot consider these allegations even if they turn out to be central to Relators' claims, given that Relators do not explicitly refer to these exhibits. Accordingly, Relators have not sufficiently met the Rule 9(b) pleading standard with regard to who made misrepresentations to Medicaid or Tri-Care authorities regarding the allegedly illegal or substandard infant treatments in the NICU during the reimbursement process.

### D.  Material Element 4: Misrepresentations by the Hospital about NICU Care

Relators allege that the Hospital submitted false claims to Medicaid or Tri-Care. It is not sufficient in pleading an FCA fraud claim, however, to merely allege that the Hospital submitted *false* claims to Medicaid or Tri-Care. Rather, as the Seventh Circuit has held in the context of an FCA fraud claim, a complaint should plead with particularity "the time, place, and content of the *misrepresentation*, and the method by which the *misrepresentation* was communicated." *Wade*, 993 F.2d at 1250 (quoting *Schiffels*, 978 F.2d at 352) (emphasis added). Furthermore, "[f]alse claim allegations must relate to actual money that was or might have been doled out by the government based upon actual and particularly-identified false representations." *Gross*, 415 F.3d at 605; *but cf. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005) (holding that "[t]he [FCA] statute provides for penalties even if (indeed, *especially* if) actual loss is hard to quantify")(emphasis in original). We accordingly examine whether Relators have met this standard in the instant action.

First, Relators must adequately plead the misleadingly false content, or misrepresentations, that underlie the alleged fraud. The Seventh Circuit has been clear that the test of whether a *false* communication amounts to a *misrepresentation* is whether the defendant has intentionally fashioned a communication to cause a payer to perceive a false statement of fact that the payer then "naturally" and materially has relied upon in making an erroneous payment. *Midwest Commerce Banking Co.*, 4 F.3d at 524 (holding that "[o]missions are actionable as implied representations when the circumstances are such that a failure to communicate a fact induces a belief in its

opposite" because "the omitted fact . . . is basic to the transaction, [and] if the nondiscloser treats the transaction as valid the [defrauded] party will *naturally* assume that all its conditions have been fulfilled") (citations omitted) (emphasis added); *see also Gross*, 415 F.3d at 604 (holding that "[a]n FCA claim premised upon an alleged false certification of compliance with statutory or regulatory requirements also requires that the certification of compliance *be a condition of or prerequisite to government payment*" and that a misrepresentation is made to "*coax* a payment of money from the government") (emphasis added); *Main*, 426 F.3d at 916-17 (holding that "[t]he [FCA] statute requires a *causal* rather than a temporal connection between fraud and payment" and that "fraud requires more than breach of promise: fraud entails making a false representation") (emphasis added).

In the instant action, Relators' amended complaint lacks any allegations about the nature of the misrepresentation or misrepresentations underlying the alleged fraud. To be sure, Relators refer throughout their complaint to the Hospital's "fraudulent" billing of Medicaid and Tri-Care. Relators also allege that unnamed Hospital employees falsely certified the Hospital's compliance with medical regulatory guidelines to Medicaid and Tri-Care. (R. A. Compl. Par. 40, 41). Yet nowhere in the amended complaint do Relators allege or explain which representations were made and by what method those representations duped Medicaid or Tri-Care into paying false claims. This oversight is partly, but only partly, attributable to Relators' failure to plead with particularity Material Element 2,

21

regarding which regulations the Hospital's alleged double-bunking, overcensus, and lack of infection controls allegedly violated.

Relators contend in the alternative that such misleadingly false content is under the exclusive control of the Hospital, and that their inability to plead certifications of compliance, reimbursement invoices, or other specific indicia of the Hospital's misrepresentations to billing authorities with particularity is therefore excusable. (R. A. Compl. Par. 69, 80, 91). In the past, when FCA plaintiff-relators have argued that they did not have access to Medicaid billing records, courts have clearly rejected such claims. *See Peterson*, 2003 WL 262515 at *2 (citing *Russell v. Epic Healthcare Mgmt. Group*, 193 F.3d 304, 308 (5th Cir. 1999)) (stating that it "is simply not true [that the claims were inaccessible] as the claims at issue were submitted to the government," and that "even if it were true, relator at the very least must plead the particular circumstances of defendants' fraud on information and belief, in which case he also must plead the factual basis for his suspicions "). Assuming that the Hospital's Medicaid and Tri-Care billing claims are within the public record, we find that Relators have not adequately pled with particularity the content of those claims. In the alternative, if specific claims are explicitly alleged not to be within the public record, but rather under the exclusive control of the Hospital, Relators should plead the particular circumstances of those claims on information and belief, consistent with our precedent.

Next, we note that other courts have acted in accord with the Seventh Circuit's guidance and have held that examples of *when* allegedly fraudulent bills were

submitted are usually necessary to a Rule 9(b) pleading. *See Obert-Hong*, 2001 WL 303692 at *2 (finding problematic that "[t]he complaint [] fails to list specific dates when defendants made these supposedly fraudulent claims"); *Garst v. Lockheed Integrated Solutions Co.*, 158 F. Supp. 2d 816, 821 (N.D. Ill. 2001) (quoting *Clausen v. Lab. Or Am., Inc.*, 198 F.R.D. 560, 564 (N.D. Ga. 2000)) (observing that it "is hard to imagine how Defendant can respond to an allegation that fraud was committed over a ten year period without knowing the time that some of the false claims were submitted, much less what the false claims actually were"). As we noted immediately above, we find that Relators have failed to adequately allege misrepresentations connected with the alleged fraud. We also find that Relators have failed to adequately plead with particularity the specific dates on which, or narrow time periods in which, alleged misrepresentations in connection with the alleged fraud were submitted by the Hospital, or the places from which or to which such misrepresentations were submitted or made.

### E. Material Element 5: Misrepresentations by the Hospital to Medicaid, Tri-Care, or Both

We note that while Relators devote much discussion to the alleged defrauding of Medicaid, they make no individual or general allegations about Tri-Care fraud stemming from treatment of Hospital NICU infants, other than to simply assert that it occurred. (R. A. Compl. Par. 1, 2, 44, 60, 61, 62, 67, 76, 87). Similar to their pleadings for the allegedly fraudulent Medicaid claims that they have referenced,

Relators contend that their lack of particularity in pleading about misrepresentations to Tri-Care is excusable because "knowledge about which babies were covered by Tri-Care and the exact dates of these submissions are particularly within the knowledge of [the] Hospital." (R. A. Compl. Par. 61). However, similar to what we found above in regard to their failure to plead Medicaid misrepresentations with particularity, Relators should be able to plead Tri-Care claims with particularity, as those claims were submitted to a government agency and therefore should be in the public record. If the claims are not public, then that fact must be so pleaded. Accordingly, we find that Relators have not met the Rule 9(b) pleading standard with specific regard to *Tri-Care* billing fraud.

Based upon the above analysis of the five Material Elements of the Relators' three FCA claims, we grant the Hospital's motion to dismiss pursuant to Rule 9(b), to the extent that it relates to FCA claims in Counts 1, 2, and 3 of Relators' first amended complaint.

## II. Remaining Claims

In regard to the remaining state claims, the Seventh Circuit has stated that where a court dismisses a federal claim and the sole basis for invoking federal jurisdiction has become nonexistent, that court should not exercise supplemental jurisdiction over remaining state law claims. *See Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 300 (7th Cir. 2003) (stating that if there is a dismissal of the original jurisdiction claim and only a supplemental jurisdiction claim remains, "the

24

sole basis for invoking federal jurisdiction is nonexistent and the federal courts should

not exercise supplemental jurisdiction over his remaining state law claims"); *Wright*

*v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994) (stating that "the

general rule is that, when all federal-law claims are dismissed before trial," the

pendent claims should be left to the state courts). In addition, under 28 U.S.C. §

1367(c)(3), a federal district court may dismiss a plaintiff's supplemental state law

claims if it "has dismissed all claims over which it has original jurisdiction." 28

U.S.C. § 1367(c)(3). The decision to dismiss supplemental claims is discretionary.

*Larsen v. City of Beloit*, 130 F.3d 1278, 1286 (7th Cir.1997). In exercising that

discretion, the court should consider a number of factors, including "the nature of the

state law claims at issue, their ease of resolution, and the actual, and avoidable,

expenditure of judicial resources . . . ." *Timm v. Mead Corp.*, 32 F.3d 273, 276 (7th

Cir. 1994). In the instant action, we have granted the Hospital's Rule 9(b) motion to

dismiss Relators' FCA claims, and the remaining claims are state law claims.

Relators and Illinois do not indicate in their respective complaints that this court has

diversity subject matter jurisdiction over the state law claims. (Resp. 12(b)(1) &

12(b)(6) Mot. 14). In addition, we have considered the relevant factors indicated

above and have determined that it is appropriate at this point to decline to exercise

jurisdiction over the state law claims, which include Relators' Counts 4-6 and Illinois'

Counts 1-5.

    As a final matter, we note that we are merely ruling on the adequacy of the

Relators' pleadings at this juncture and are not making any findings regarding the

merits of either Relators' or Illinois' claims. In the event that the statute of limitations

would bar the proper refiling of a complaint, an appropriate motion for reconsideration within ten business days of this decision may be filed.

## CONCLUSION

Based on the foregoing analysis, we grant the Hospital's Rule 9(b) motion to dismiss Relators' FCA claims (Count 1-3). We deny the Hospital's Rule 9(b) motion to dismiss Relators' state law claims (Counts 4-6) and the Illinois complaint (Counts 1-5) as moot. We decline to exercise supplemental jurisdiction over both Relators' and Illinois' state law claims, and deny as moot the Hospital's motion to dismiss brought pursuant to Rule 12(b)(1) and Rule 12(b)(6).

Samuel Der-Yeghiayan
United States District Court Judge

Dated: February 28, 2006